## Cintrón v. Banco Territorial y Agrícola.

## Appeal from the District Court of San Juan.

No. 49.—Decided June 24, 1905.

Obligations—Confusion of Rights—Extinguishment of Obligation.—In order that a confusion of rights may be successfully alleged in contesting a foreclosure proceeding, it is necessary that such confusion shall have taken place in relation to the obligation upon which the action is based, and that the same shall have been extinguished by virtue of such confusion, which will have no effect whatever in this respect where it has taken place in relation to an obligation which was distinct and independent of the one upon which such action is based.

Id.—Obligations Demandable.—Every debt certain, due and owing is perfectly demandable in law.

Mortgage—Foreclosure Proceeding—Mortgage Bonds—Holders of Bonds.—Mortgage bonds of the Banco Territorial y Agrícola are payable to bearer, as neither the provision of the last paragraph of article 171 of the Regulations for the execution of the Mortgage Law nor the second paragraph of article 172 thereof are applicable to the holders of such mortgage bonds.

Id.—Publication of Notice of Public Sale.—Publication of notices of a public sale, referred to by article 172 of the Regulations for the execution of the Mortgage Law, must state the place at which the sale will be held, and such sale cannot be held at a different place from the one so designated; and a sale will be null and void if it is held at any other place than the one so designated.

Id.—The ordinary form usually employed by the courts to designate the place at which a public sale will be held, stating that such sale will be held before the court authorizing the publication of the notice, is good in cases where the court exercises its jurisdiction only at the principal town in the district, but not when such jurisdiction may be exercised at other places.

Id.—Number of Public Sales Which May Be Held.—Article 127 of the Mortgage Law, in so far as it refers to only one public sale, has been repealed by the subsequent provisions of the same law and its Regulations which authorize the holding of more than one public sale in proceedings to recover upon mortgage credits.

Id.—Public Sale and Award Null and Void.—The nullity of a public sale necessarily carries with it the nullity of the award and other acts performed in virtue thereof.

Id.—Grantee—Damages and Losses—Payment for Products.—The annulment of a public sale not brought about by duress, but by reason of an erroneous judicial determination, cannot serve as a basis for an action for damages and losses against the grantee, who by reason of such annulment becomes a mere administrator of the property awarded and as such bound only to pay for the fruits produced and which should have been produced during his possession of the property as such grantee.

The facts are stated in the opinion.

*Mr. Juan Guzman Benitez* for appellant.

*Mr. Jose Guzman Benitez* for respondent.

MR. JUSTICE HERNÁNDEZ delivered the opinion of the court.

By public instrument executed in this city of San Juan on April 29, 1895, the agricultural firm of Cintrón Hermanos, doing business in the town of Yabucoa, and consisting of José Facundo, Zoilo, Margarita and Eulalia Cintrón, the two last named the wives of Mariano Martorell and Aurelio Dapena, respectively, acknowledged an indebtedness to the Banco Territorial y Agrícola of Porto Rico, in the sum of 90,000 Mexican *pesos,* equal to 85,500 provincial *pesos,* which with interest thereon at the rate of 9 per cent per annum added to the principal, in accordance with the amortization schedules of said bank, said firm agreed to pay in its own offices in gold or silver coin constituting legal currency in the province on the date of payment, in twenty annual payments divided into forty equal *semesters,* with the exception of the last, on account of the deduction therefrom of one *semester* interest in advance, each of the preceding thirty-nine half-yearly payments in settlement amounting to 4,683.09 *pesos,* provincial currency, due and payable on October 30, 1895, and on April 30th and October 30th of the years 1896 to 1914, inclusive, and the last *semester* amounting to 835.59 *pesos,* provincial currency, due and payable April 30, 1905. It was stipulated in this instrument that if two installments should fall due and remain unpaid, the entire pending debt would be considered due, the bank being authorized to collect it with interests, costs and the expense covering the collection and a commission of 1 per cent stipulated in cases of payments in advance, the said firm having mortgaged to secure the payment of the debt and interest, and 2,000 *pesos* more to cover the additional interest on half-yearly installments and insurance premiums which might not be paid when due, and 2,000 *pesos* more for advance costs and payments, the sugar plantation, or *central* for the manufacture of sugar, called "Laura,"

situated in the *barrio* of Limones, in the municipal district of Yabucoa, having an area of 491.56 *cuerdas,* and other lands appurtenant to said plantation consisting of rural tracts having an area of 440.28 *cuerdas,* known by the names of "Cercado Diamente" and "Dos Rios," and another tract of land having an area of 231.48 *cuerdas,* called "Palmarejo" and "Margarita," the cash liabilities to which each tract was subject being stated.

By another instrument dated August 4, 1899, the firm of Cintrón Hermanos acknowledged that is was indebted to the Banco Territorial y Agrícola, by reason of the fifth, sixth, seventh and eighth installments of the mortgage deed of April 29, 1895, and other supplementary ones, in the sum of $12,696.12, provincial currency, past due, according to a liquidation made on June 30th of said year 1899; and the parties furthermore agreed on a loan of 10,000 *pesos* in mortgage bonds at par, bearing interest at the rate of 9 per cent per annum, of which loan Cintrón Hermanos received 5,000 *pesos,* the bank agreeing to pay the remaining 5,000 in October of the same year. To guarantee the payment of the 12,696.21 *pesos,* and of the 10,000 *pesos,* with interest on both sums, Cintrón Hermanos delivered and conveyed to the bank all the sugar to be produced on the sugar plantations of the "Laura Central" and appurtenant lands.

By a subsequent instrument, dated November 16, 1899, Cintrón Hermanos acknowledged the receipt of the 5,000 *pesos* pending payment of the loan made by that of August 4th of the same year, and in addition, $15,000, current money, in mortgage bonds, for the reconstruction of the buildings of the "Laura Central," destroyed by the cyclone of San Ciriaco. To secure the payment of the balance of the 12,696.21 *pesos* referred to in the liquidation of June 30, 1899, the loan of the 10,000 *pesos* and the loan of the 15,000 *pesos* for the reconstruction of the buildings of the "Laura" plant, with interest on all these sums at the rate of 9 per cent per annum, the debtors gave a number of securities, including the cane

crops of the sugar-cane plantations of the "Laura Central" which had already been transferred to the bank, the rattoons and new plantings of the said plantations, all the products thereof, including the part of the planters on shares, the 3 kilometers of railway, the 110 cars, the carts, other equipment of the estate, and the right to acquire the ownership of 200 oxen given as security to Gonzalez and Alonso to secure amounts which the bank could pay for the account of Cintrón Hermanos.

By a private document of March 17, 1900, the loan of 10,-000 *pesos* was cancelled, 1,567.50 *pesos* were paid in mortgage bonds, on account of the repairs to the "Laura Central," and the bank delivered to Cintron Hermanos 18,887 *pesos* as a loan at the reciprocal interest of 9 per cent per annum and a commission of 4 per cent per month in favor of the bank. With part of the said sum Gonzalez and Alonso were paid the obligations of Cintrón Hermanos secured by 200 oxen of the "Central Laura," the ownership of such oxen becoming, under the agreement made, part of the security given the bank; it being stipulated that without prejudice to the cancellation of the loan of 10,000 *pesos,* all other sums due the bank would continue to be secured by the sugar-cane plantings, their rattoons, new plantings and their products, oxen, railway, cars, carts and other equipment and appurtenances of the "Laura Central."

By public instrument of May 19, 1900, the Banco Territorial y Agrícola and Cintrón Hermanos entered into another contract involving a mortgage loan for the sum of $12,000, payable in two years, with interest at the rate of 9 per cent per annum, payable in yearly installments at the end of each year, constituting in favor of the bank a second mortgage on the "Laura" plantation and the plantations appurtenant thereto, which instrument was to be presented in the registry of property and delivered to the bank after being recorded within a period of twenty days, with a certificate issued by the registrar embodying its record and showing that said estates

were not subject to any other charges than the first and second mortgages in favor of the bank.

Of the documents mentioned, the only ones of which certified copies appear in the record, are the two mortgage deeds of April 29, 1895, and May 10, 1900, although reference is made to the others in another instrument of May 23d of said year.

It should be noted that in the eighth statement of fact of said instrument of May 23, 1900, it was stated that the bank and Cintrón Hermanos had made a liquidation on the 17th of said month of May of the claims other than mortgage claims which the Banco Territorial y Agrícola had against Cintrón Hermanos, said liquidation showing that the said company owed the bank the sum of 49,170.57 *pesos,* provincial currency, which the parties reduced and fixed at $29,502.34, as its equivalent in American gold.

In the ninth statement of the said instrument of May 23d, it was stated that Cintrón Hermanos had deposited in the bank on account of the total debt of $29,502.34, which was the amount showed by the liquidation of May 17, 1900, the sum of $9,325.44 to be finally credited as soon as they delivered to the bank the first recorded copy of the instrument constituting the second mortgage of May 19, 1900, with the certificate of its record in the registry, after which credit the amount of the debt would be reduced to $21,176.90.

It also appears in the tenth statement of the instrument of May 23, 1900, that the small product promised by the crop of that year of the "Laura Central" and its appurtenant estates, and the difficulties of giving the necessary impulsion to the working thereof to obtain the greatest production possible, had shown Cintrón Hermanos their inability to comply with their obligations to the bank, for which reason, in order to comply with a part thereof, they not only requested the mortgage loan of $12,000 referred to in the instrument of May 19, 1900, but the other mortgage loan constituted by the instrument of April 29, 1895, being also due on account of the

ninth and tenth installments thereof not having been paid, they had offered the bank to waive all the rights which they might have by virtue of the suspension of the proceedings for the recovery of mortgage loans, those granted by General Orders of January 19 and 31, 1899, as well as any others which might be deduced from any other similar provisions of the Government, the Legislature, or of any other origin, *in order that if the bank should consider it in furtherance of its interests, it might, by private agreement or judicially, assume the administration of the estate, cultivating it, harvesting the growing cane crops and any others planted, and those of the growers on shares, and tenants, devoting the proceeds from all sources to the reimbursement of the expense of administration, interest, insurance premiums and the unpaid principal of the aforementioned mortgage of April 29, 1905.*

According to the eleventh statement of the said instrument of May 23, 1900, Cintrón Hermanos, in order to pay the bank the $21,176.50 which they owed it according to the liquidation of accounts other than mortgage accounts made on May 17, 1900, after having made the final payment of the sum of $8,325.44 deposited for this purpose, they requested of the bank the grant of two credits, one for $9,000, which they would guarantee with the 200 oxen, 3 kilometers of railway, the 110 cars, equipment, tools, and other agricultural implements of the *"Laura" sugar central, and another of $12,176.90, which they would guarantee by the finished products, plantings made and to be made on the "Laura Central," and the products of the crops of 1900 and 1901 to 1902, including the products pertaining to said central from the sugar cane of the planters on shares, and tenants, the bank to take charge of the administration of the "Laura" sugar central and appurtenant estates to make effective said guarantee.*

In order to formalize both loan contracts Cintrón Hermanos and the Banco Territorial y Agrícola executed the in-

strument of May 23, 1900, which, after setting forth the facts stated, contains the principal clauses which follow:

"First. The agricultural firm of Cintron Hermanos acknowledges that it has on this date received, although before the execution of this instrument, from the Banco Territorial y Agricola of Porto Rico, the sum of $9,000, American gold, which it agrees to repay with reciprocal interest at the rate of 9 per cent per annum within the term of one year from this date; but this term shall be considered to have expired, and the bank may demand the payment of the principal and interest at once, if the 'Laura' sugar *central* and the estates appurtenant thereto should be sold, awarded or leased to third persons or to the bank itself, whatever be the cause of its transfer or lease.

"Second. Said agricultural company of Cintron Hermanos, and its manager and administrator, Aurelio Dapena y Moreno, in its name and on its behalf, acknowledges the receipt from the Banco Territorial y Agricola of Porto Rico, also on this date, although before the execution of this instrument, of the sum of $12,176.90, American gold, which it undertakes to pay with reciprocal interest at the rate of 9 per cent per annum, within a term not exceeding the 15th day of July of the current year, which is fixed as the date of the expiration thereof.

"Third. The obligation of the payment of the $9,000, American gold, contracted in the first clause, is secured by the 200 oxen, 3 kilometers of railway, the 110 cars, the carts, tools, implements and appliances for cultivation and tillage, already transferred to the bank by prior contracts relating to the 'Laura' sugar factory and *central*, and which, for the purposes of this guarantee, the firm of Cintron Hermanos again transfer to the bank, without any reservation whatsoever; it being understood that until the obligations to pay said principal and interest are cancelled in full, all such property shall be considered as specially subject to the payment of any balance due, and in the event of realization thereon or its sale, by common agreement, the parties appraise said property at the rate of $40 for every ox, $2,000 for the 3 kilometers of railway, $20 for each car, and they agree that the carts and implements, tools and agricultural appliances shall be appraised by two experts appointed by the parties in accordance with the provisions governing compulsory proceedings in actions for execution contained in the Law of Civil Procedure.

"Fourth. The obligation for the payment of the $12,176.90, and interest thereon, contracted by Cintron Hermanos, in the second clause, is secured by the sugar-cane plantings on the 'Laura Central'

and the appurtenant estates already conveyed to the bank by prior agreements, and by the products manufactured and to be manufactured, rattoons and new plantings for the next crop, and the fruits and products of all kinds corresponding to the 'Laura' sugar *central* in this as well as in the next crop of 1901-02 from its own plantings or its share from plantings of growers on shares and tenants; to this end Cintron Hermanos convey and deliver at once to the Banco Territorial y Argicola of Porto Rico said crops, plantings, rattoons, fruits and products, and the bank shall hold all of the property until the total cancellation of the said obligations including principal and interest, and may exercise all the rights and adopt all the measures with respect to the crops, fruits and products of the 'Laura' sugar plantation and central recognized in its favor by the deeds of August 4 and November 16, 1899, described in statements numbers 5 and 6 hereof.

"Fifth. The firm of Cintron Hermanos is constituted the depositary of the property, plantings, fruits and products, manufactured or to be manufactured, and property comprised in all the guarantees and transfers made, binding itself to hold them all at the disposition of the bank and deliver them to it when the bank should call on said firm to do so, under the penalties and liabilities established by article 559 of the Law of Civil Procedure; and with regard to the maintenance and sale, in a proper case, of such property and goods, Cintron Hermanos expressly submit to the rules contained in articles 39, 40 and 41 of the by-laws of the bank, with which they are perfectly acquainted.

Sixth. For the purpose of making the payment of the $12,176.90, American gold, of the obligation contracted in the second clause, and the interest *thereon, the agricultural firm of Cintrón Hermanos, and in its name and on its behalf, Aurelio Dapena y Moreno, delivers to the Banco Territorial y Agrícola of Porto Rico, and the latter receives the administration and management of the 'Laura' sugar plantation and central, and of the estates or lands appurtenant thereto, and as a consequence hereof the bank shall sell the fruits and products of the estate crediting the proceeds to the account of this debt; and it shall incur such expenses as it may consider necessary and to the extent deemed advisable for the maintenance of the cultivation and plantings and the manufacture thereof to convert them into salable products, debiting said account therewith.*

"Seventh. It is agreed that the bank shall pay to DeFord & Co., charging the amount to the account of the administration of the 'Laura' sugar plantation and *central*, the pledge obligations which

Cintron Hermanos owe them, one of 6,768, provincial *pesos,* falling due June 26th next, and another of 3,750, provincial *pesos,* respectively, secured by 188 mortgage bonds of the second issue of the bank, and 50 bonds of the same class of the fifth issue, and upon receiving the bonds pledged it shall credit to the same account the entire face value thereof including that of the current coupon due.

"Eighth. The bank shall receive on all the products and fruits which it may sell or realize on a commission of 2 per cent as payment for its administrative management.

"Ninth. The parties shall make by mutual agreement an inventory of the 'Laura' plantation and estates appurtenant thereto, comprising therein all the property and securities given the bank as security, which inventory they shall sign and which will serve as a guide. for the purposes of this contract, especially with respect to the liabilities of the depositaries, Cintron Hermanos, and to report the property delivered to the bank in administration.

"Tenth. For the purposes which may be proper in due time Cintron Hermanos declare that it is not advisable for them to take advantage of the provisions in force relating to the suspension of the collection of the principal of mortgage loans on rural property, and, consequently, they waive in the most formal and solemn manner any rights which might be derived from these provisions or any other provisions of a similar character which may be issued, whatever be their origin; *so that if the creditor bank should demand the administration of the 'Laura Central' and of the other estates appurtenant thereto to secure payment of the first mortgage, the entire amount of which is due and payable owing to the ninth and tenth installments thereof, past due, not having been paid, it may assume the administration of said estate to collect not only the interest due and to become due, but also the entire principal unpaid, the expenses and costs.*

"Eleventh. *Cintron Hermanos shall approve or object to, giving the reasons therefor, the expense accounts of the administration of the estate of which the bank has assumed charge, in the offices of the latter, every thirty days, to be reckoned from this date, and they agree that if they should not make their objections within the terms mentioned, or approve the accounts, that they will accept the results of the accounting of the bank.*

"Twelfth. The debtors, Cintron Hermanos, may at any time settle the sums which they now owe the bank and those which they may owe it hereafter, with interest, costs and expenses to the date of payment, and upon doing so they may freely dispose of the property

and securities subject to the liability of the sum paid, if the obligation secured thereby should be entirely cancelled.

"Thirteenth. For all acts, notifications, citations, claims and judicial and extra-judicial or private proceedings arising out of this contract, the bank may deal with and address itself to any of the partners, managers or administrators of the agricultural firm of Cintron Hermanos; and in the event of the dissolution of the partnership to the liquidators thereof or to any of its legal representatives or co-owners of the estates, or the party obligated to the payment of the debts, Cintron Hermanos to this end waiving the right of being personally summoned or notified and imposing on their successors, successors in right and legal representatives the obligation of accepting as if served on all of them personally, all notices, citations, claims and process served on one alone; for all of which, private or judicial, and for the other purposes of this instrument, the parties hereto now submit expressly to the courts of this city of San Juan, created by General Order No. 118, Series of 1899, or to such as may substitute them.

"Fourteenth. All the costs and fees of this document and a copy thereof, and any others derived therefrom, shall be defrayed by Cintron Hermanos, as the bank is not to be called on to defray any expenses whatsoever, and is to receive in full the sums owed it, with the interest stipulated, free from expense and costs.

"Fifteenth. The Banco Territorial y Agricola of Porto Rico, and, on its behalf, its director and manager, Vicente Antonetti y Antonini, declares that by the deposit of the $8,325.44 referred to in the ninth statement of fact of this instrument, and the amount of the two credits granted to Cintron Hermanos, the latter have paid the bank the 49,170.57 *pesos,* provincial currency, equivalent to $29,502.34, American gold, the total of the liquidations of accounts other than mortgage accounts made on the 17th instant and mentioned in the eighth statement of fact, and, the bank executes a formal receipt to Cintron Hermanos for the sum which they have paid it, although leaving it pending with regard to the amount of the deposit, until final payment is made by compliance with the obligation of delivering the documents referred to in the ninth statement of fact."

With matters in this state, on September 30, 1902, the Banco Territorial y Agrícola, represented by Attorney Juan Guzman Benitez, instituted foreclosure proceedings in the District Court of Humacao against the agricultural firm of

Cintrón Hermanos, under the procedure authorized by the Mortgage Law and its Regulations, praying that the said firm should be required to pay the bank, the execution creditor, within a period of thirty days, the sum of $58,105.82, which said firm owed under the mortgage constituted by the instrument of April 29, 1895, as principal and insurance premiums, interest on said sums to the said 25th of September, and commission payable in advance, stipulated in said instrument, as well as additional interest at the same rate of 9 per cent per annum on the principal and insurance premiums from the aforementioned date to the date of payment, the renewals of the insurance with interest thereon which the bank might have to pay, and the amount of all the expenses and costs which might be caused the creditor bank in connection with the mortgage, and that Cintrón Hermanos be notified that the property mortgaged would be offered at public sale for the price fixed in the contract if they did not make the payment.

The bank alleged in support of its complaint the stipulations of the mortgage deed of April 29, 1895, and explained that Cintrón Hermanos had paid the first eight half-yearly installments of the debt, representing 7,986.73 provincial *pesos* of the principal, which, deducted from the 85,500 provincial *pesos,* the sum loaned, reduced the debt by way of principal to 77,513.22 provincial *pesos,* which, at the market rate of exchange were equivalent to $46,507.93, on April 30, 1899, which was the date the eighth and last installment paid fell due; that owing to the debtors not having paid in due time, the bank was obliged to pay for their account the sum of 306.64 *pesos* on October 8, 1900, and 313.74 *pesos* on October 7, 1901, for renewals of insurance premiums; that after the eighth half-yearly installment of the mortgage six more installments fell due on October 30th of 1899, on April 30th and October 30th of 1900 and 1901, and on April 30th of 1902, without having been paid, the entire debt of the pending principal having become due upon default in the payment of the first two of said unpaid installments; that the interest agreed

on at the rate of 9 per cent per annum having been liquidated to September 25, 1902, on the 46,507.93 *pesos* of principal from April 30, 1899; on the $306.64 insurance from October 8, 1900, and on the $313.74, also insurance, from October 7, 1901, and adding 1 per cent of the $46,508 agreed on as commission payable in advance on the principal remaining unpaid, according to the agreement contained in the deed, the result is $61,931.20, American currency, value on September 25, 1902, from which sum is to be deducted an amount equivalent to $2,308.50, American currency, which at the time the loan was made the debtors paid as advance interest, and the interest on said sum to September 25, 1902, at the same rate of 9 per cent, which interest amounts to $1,518.88, leaving a balance in favor of the bank of $58,103.82, American currency, which is the amount contained in the demand prayed for, distributed in the following manner: Unpaid principal of the loan, $46,507.92; insurance premiums paid by the bank, $620.38; interest at 9 per cent on both sums reckoned to September 25, 1902, $10,510.43; commission payable in advance, $465.08; total, $58,103.82, which the defendants should be required to pay, and which they should also pay in due time, from September 25, 1902, to the date of payment, the new interest accruing at the same rate of 9 per cent on the principal and the insurance premiums with interest thereon which might have to be paid, and the costs incurred or which may be incurred until the termination of the compulsory proceedings.

The bank also stated in its complaint that the firm of Cintrón Hermanos had, by public instrument of May 19, 1900, agreed to pay it the sum of $1,200, with interest at the rate of 9 per cent per annum, within a period of two years, expiring on May 19, 1902, it being agreed that if by such date the principal and interest had not been paid, the sum total of the interest and principal would also earn interest after such period at the rate of 9 per cent, and to secure the repayment of the principal loaned, the payment of the interest thereon, the

loss caused by the delay in paying the principal and interest, and costs and expenses, loss and damage being stipulated not to exceed $1,000, Cintrón Hermanos mortgaged in favor of the bank the same property which they had previously mortgaged, which debt they also failed to pay, and which amounts with interest to May 19, 1902, according to a correction made in a subsequent statement, to $14,160, to which should be added $450.46, as interest for the delay in payment to September 25, 1902, making a net total on said date of $14,610.46, and it was shown during the course of the execution proceedings that the bank offered for the mortgaged property the amount of this credit in addition to the first mortgage upon which the execution was based.

The District Court of Humacao, by order of the following 10th of October, issued the demand for payment in the terms prayed by the Banco Territorial y Agrícola, and this demand was served on the 20th of said month of October on Mariano Martorell, who stated that he had not been nor was then the manager of the agricultural firm of Cintrón Hermanos, and that there was no manager because the property was under the administration of the Banco Territorial y Agricola; a similar demand was served on the following 3d of November on Margarita Cintrón, attended by her legitimate husband, Mariano Martorell, who stated that they protested against the execution in order to enforce their rights in due time and when it suited them.

Upon the petition of the Banco Territorial y Agrícola, the Humacao court, by order of December 18, 1902, directed that the property mortgaged should be offered at public sale for a period of twenty days for the value fixed in the contract, and that the sale should be announced by notices to be published in the *Porto Rico Sun,* and posted in public places in the district in which such property is located, and in the usual places in the city of Humacao, the notices to state that no bids would be considered which were under two-thirds of the amount fixed for the public sale; that the bidders would be required

to deposit in advance 10 per cent of the value of such property with the court, and that they would have to accept the titles of ownership which were to be described in the notices, in accordance with the terms of the mortgage deed. January 22, 1903, at 2 p. m., was set for the public sale.

The notice announcing the public sale of the mortgaged property was published in No. 310 of the newspaper called *El Heraldo Español* of Porto Rico, corresponding to December 30, 1902, and it was posted in the town of Yabucoa and in the usual place in the city of Humacao, for a period of twenty days. The notice contained a description of the property as contained in the title on which the execution was based, and a statement of the value given to each estate, and also that the public sale would be held on January 22, 1903, in the District Court of Humacao; that the bids would have to cover two-thirds of the appraised value, and that the bidders would be required to deposit 10 per cent thereof in advance.

On the date mentioned, January 22, 1903, the sale announced was held in Humacao, without any bidders appearing, and, upon the petition of the Banco Territorial y Agrícola, dated the following day, the Humacao court, by order of February 13, 1903, ordered that the property mortgaged be again offered at public sale for a period of twenty days, with a reduction of 25 per cent on the appraised value. This sale was announced with the same formalities as the previous one, and March 17th, at 2 p. m., was fixed for the sale.

This sale was announced in the newspaper *El Heraldo Español* of Porto Rico, No. 41, corresponding to February 18, 1903, and posted in the town of Yabucoa, and in the usual place in the city of Humacao, for a period of twenty days, the notice complying with the same formalities as the notices for the previous sale, and stating that the sale would take place in the Humacao court on March 17th; that no bids would be admitted for less than two-thirds of the amount fixed as the basis of this second sale.

The second public sale was held in Guayama on the day and hour fixed, without any bidders appearing.

On the following day, March 18th, counsel for the Banco Territorial y Agrícola filed a petition in the Humacao court praying for the award to it of the property offered at public sales for two-thirds of the price which served as a basis for the second sale; that is to say, for the sum of $67,283.05, which represented two-thirds of $100,879.57, to which sum the valuation of said property had been reduced by the parties from $134,506.09, after the deduction of 25 per cent; and in a supplementary prayer he stated, that on the first mortgage as liquidated on the 31st of said month of March, amounting to $62,044.61, according to the liquidation produced with the documents establishing it, and on the amount of the second mortgage, which was also due, with interest to the 31st of said month of March, amounting to $15,163.85, both items making a total indebtedness of $77,208.46, and deducting therefrom the price of the award which represented $67,253.05, there remained in favor of the bank a balance of $9,995.41, for which reason he prayed that without prejudice to decreeing the award requested at once that the debtors be shown the liquidation effected, and that they be informed that the property had been awarded to the bank for the sum of $67,253.05, and that they still owed it by reason of mortgages past due the sum of $9,955.41, with interest at the rate of 9 per cent per annum from said 31st of March to the date of payment, without prejudice to the costs of the proceedings.

By order of March 26th the Humacao court awarded to the bank for the sum of $67,253.05 the estates mortgaged in its favor, with everything thereon in settlement as far as possible of the amount claimed, accrued interest, insurance premiums, commission and costs, also granting the supplementary prayer of the bank in its petition of March 18th.

Notice of the order of award having been served on Cintrón Hermanos, they took an appeal therefrom, which was denied, and on May 26, 1903, the bank was placed in posses-

sion of the property awarded, thus terminating the compulsory proceedings prosecuted by the bank against Cintrón Hermanos.

Attorney José Maria Cuadra, on behalf of Eulalia and Margarita Cintrón, partners in the agricultural firm of Cintrón Hermanos, and in the name of Aurea Cuadra, as the mother of the minors José Luis and José Cintrón, had by her marriage with José Facundo Cintrón, deceased, also a partner in the firm of Cintrón Hermanos, brought an action in the District Court of San Juan on April 28, 1903, against the Banco Territorial y Agrícola, praying: (1) That the award to the said bank by the District Court of Humacao of the "Laura Central," situated in Yabucoa, with the appurtenant Estates and everything thereon, be declared null and void, as well as all the proceedings had to reach the result, and all the acts performed by reason of such award, and that matters be placed in the condition in which they were before the institution of the summary execution proceedings against the firm of Cintrón Hermanos; (2) That the said bank also be required to indemnify the members of the said firm of Cintrón Hermanos, now dissolved, for all the loss and damage caused them by this procedure and its administration, the amount thereof to be fixed by experts appointed by both parties and a third expert to be appointed by the court in the event of disagreement between the other two; (3) That it also be held that the said bank shall pay the owners of the property awarded, not only the profit derived therefrom, but all the profit which such property should have produced for them since it took charge of the administration thereof; and (4) That an order issue that in accordance with the preceding resolutions, a liquidation be made by experts to be appointed also by the parties, and a third expert to be appointed by the court in the event of disagreement, of all the credits which the bank charges against Cintrón Hermanos, both mortgage and ordinary, in order that the true amount thereof may be fixed, for the payment of which, with the proceeds

from said property, it shall continue to administer it subject to the agreements contained in the instrument of May 23, 1900, unless both parties should agree otherwise in view of the result of such liquidation, the costs being taxed against said bank, if it should contest this action.

As statements of fact in support of the foregoing complaint, the plaintiff agricultural company alleged the existence of the mortgage credit of 90,000 Mexican *pesos* which the bank had loaned it, one-half in cash and one-half in mortgage bonds, under the conditions set forth in the public instrument of April 29, 1895, which served as a basis for the initial complaint in the compulsory proceedings prosecuted by the bank against Cintrón Hermanos; it also made a statement of the various obligations contracted by said company towards the bank in the other public instrument of August 4, 1899, in that of November 16th of the same year, in the private document of March 17, 1900, in the liquidation of May 17th of the same year, in the other mortgage deed of said May 19th, and in the other instrument of the 23d of the same month of May; of all of which documents mention has previously been made with reference to their contents. Cintrón Hermanos furthermore add that as a consequence of the agreement made in the instrument of May 23, 1900, an inventory and appraisal was made of the buildings and machinery on the ''Laura'' plantation, amounting to $52,450, and another inventory, without any prices being set out, made by an employe of the said bank and the superintendent of the ''Laura'' plantation, of the cars, carts and other appurtenances and equipment thereof, as also of the cattle and horses pledged to secure the credit of $9,000 contracted by the instrument of May 23, 1900, and likewise of the plantings thereon which constituted part of the pledge given to secure the other debt of $12,176.90 contracted by the same instrument. According to this inventory there were on the ''Laura'' plantation 417½ *cuerdas* of sugar cane, of which 302 were rattoons of the first cut; that this second debt of

$12,176.90, for the payment of which, according to the sixth clause of the instrument of May 23, 1900, there was turned over to the bank in the first place the administration of the "Laura" and other appurtenant estates, was fully paid in the said year of 1900, and if after collecting this debt the bank continued, as it did, administering said estates, it has been under the provisions of the tenth clause of said instrument of May 23, 1900, to devote the proceeds from all sources to reimbursing itself, after paying the expenses of administration, for the interest, insurance premiums, commissions and unpaid principal of the first mortgage constituted on April 29, 1905; that the bank after having taken charge of the management of all the property of Cintrón Hermanos, instead of administering it as a good father of a family, in order to increase the profit therefrom, abandoned the cultivation and manufacture of the products of the "Laura Central" in order to work another in which some of the directors of said bank were and are interested, and when it had completely ruined the "Laura Central" it brought a formal action in the District Court of Humacao against Cintrón Hermanos for the recovery of $58,103.82, which it alleged said firm owed it by reason of principal and insurance premiums, interest on these sums to September 25, 1902, and advance commission, according to the instrument of April 29, 1895, as well as additional interest and renewal of insurance accruing since that date, and the amount of all the expenses and costs caused the creditor; that the liquidation made by the bank, according to which the indebtedness of Cintrón Hermanos payable on September 25, 1902, amounted to the said sum of $58,103.82, had not been accepted by the firm of Cintrón Hermanos, and was, furthermore, incorrect, as shown by the terms of the complaint itself, nor was it liquidated or payable, because the bank had agreed to collect its credit from the profits of the "Laura Central," which it had possessed and managed for this purpose since the year 1900, it being therefore evident that this amount is higher than that which

Cintrón Hermanos really owed in September, 1902; that the bank made no mention in its complaint of certain facts embodied in the instrument of May 23, 1900, which greatly modified the mortgage obligation of April 29, 1895, extinguishing it by novation and confusion, although in stating the grounds of law in support of said complaint it acknowledged that by the mere act of filing such complaint it became subject to indemnifying any loss or damage which might be caused the debtors or third persons interested through malice or negligence in a true statement of facts; that the bank also remained silent upon the circumstances which would have had a powerful influence upon the decision of the Humacao court with regard to authorizing the summary execution proceedings and the form of prosecuting them, one of these circumstances being the submortgage constituted by the said bank in favor of the holders of its bonds on the very mortgage which it was foreclosing, and the other, the complaint which the plaintiff had filed in a declaratory action in the District Court of San Juan seeking the cancellation of said submortgage, on the ground that the holders of said bonds are the real owners of the mortgage, for the foreclosure of which it instituted execution proceedings; that the holders of said bonds were not notified nor cited for the public sale, and the notes for the first sale which were published only in one newspaper of this city with a small circulation, did not contain a detailed statement of the value of the property to be sold and of the liabilities to which it was subject; and that notwithstanding the fact that the debtors had in due time demanded that these omissions and deficiencies be corrected before the second sale, such sale took place on March 17, 1902, in the town of Guayama, a place not the capital of the district, which is Humacao, without their demands being complied with and without the notices which were published once only in a newspaper of this city stating the place of the sale, and without the debtors being notified notwithstanding the fact that they had entered an appearance in the proceedings. The

firm of Cintrón Hermanos advanced as provisions of law in support of their contentions articles 144 of the Mortgage Law; 169, 171, 172 and 175 of the Regulations for its execution; 1160, 1171 and 1172 of the Civil Code; and 1433, 1436, 1438 and 1455 of the Law of Civil Procedure; and it concluded with the prayer that judgment be rendered in accordance with its prayers.

The plaintiff filed a supplemental complaint setting out as further facts in support thereof, that the Banco Territorial y Agrícola was the first and only mortgage creditor of Cintrón Hermanos, the contracting parties having by mutual agreement fixed the value of the estates mortgaged in the mortgage deed of April 29, 1895, and upon this property being offered for sale, after the thirty days of the demand had expired, not only was it stated in the notices that bids for two-thirds of the appraised value thereof would be admitted, but two sales were held, a reduction being made in the second sale of one-quarter of the agreed valuation, which resulted in the property being awarded to the creditor for one-half the value at which the parties themselves had appraised it, owing to no bidders appearing either at the first or the second sale, thus violating the provisions of articles 127 and 128 of the Mortgage Law, from which it is to be deduced that more than one sale could not be held, nor the sale effected, nor the award made, except for the value fixed in the instrument and in the first announcement published.

The Banco Territorial y Agrícola, in answering the supplemental complaint, stated that it was in accord with the agreements it had made with Cintrón Hermanos in the various documents invoked by the plaintiff in its complaint, and also agrees to the fact embodied in the instrument of May 23, 1900, to the effect that the unpaid portion of the first mortgage is payable, and, furthermore, that if the bank should deem it in furtherance of its interests it could assume the administration of the estate by private agreement or judicially, devoting the profits therefrom to reimbursing itself

for the cost of administration and interest, insurance premiums, and unpaid principal of the first mortgage; but it adds that, according to the sixth clause of said instrument, the administration of "Laura Central" was turned over to the bank for the collection of the $12,176.90, representing the balance of debts other than mortgage debts, it being stipulated that "as a consequence the bank will sell the fruits and products of the Estate and credit the proceeds to the account of said debt, and it shall incur such expenses as it may consider necessary and to the extent deemed advisable for the maintenance of the cultivation and crops and the elaboration thereof to convert them into salable products, debiting said account therewith." By the seventh clause it was also agreed that the bank should pay for Cintrón Hermanos to De Ford & Co. two obligations, the total amount of which, 10,518 provincial *pesos,* it was to charge to the account of the administration; on the other hand crediting thereto the full face value, with the amount of the current coupon due, of the 188 bonds of the second issue and the 50 of the fifth which were pledged as security, of which the bank was to take charge; that Cintrón Hermanos agreed to pay the bank the said debt of $12,176.90, with interest at the rate of 9 per cent per annum from May 17, 1900, the date of the liquidation, within a term which should not exceed July 15th of the same year, and on this date the account of the credits entered in favor of said debt, without considering the debt of the expenses or the commission agreed on, had reduced the debt to $6,364.69 only; while the account of the expenses of administration showed a balance in favor of the bank of $4,638.03, which, added to the former, gives a total of $11,002.72, without counting the commission on the sale of sugar not yet entered, without on such date the payment having been made to De Ford & Co. of the 10,518 provincial *pesos,* chargeable to the account of the administration of the "Laura" plantation and *central,* and without the bonds pledged having been credited, as agreed; that on January 28, 1901, that is to say, twenty-

eight days after the expiration of the year 1900, during which Cintrón Hermanos claim they paid the $12,176.90 of said debt, both accounts were liquidated, that of the debt and that of the administration of the "Laura Central," the two showing a balance in favor of the bank of $17,816.67; that Cintrón Hermanos never availed themselves of their right to question the accounts of the administration every thirty days, for which reason such accounts were to be considered as approved, as agreed; but such accounts were sent to them and on March 6, 1901, they expressed their agreement therewith; that the bank continued the administration of the Estate, not only under the right it had, but at the request of Cintrón Hermanos, to collect the administration account, and on June 30, 1901, it again submitted said account which began with the last balance which had been accepted of $17,810.67, and closed with a balance in favor of the bank of $11,723.44, to which balance Cintrón Hermanos signed their agreement on August 25th of the same year; that the bank submitted a new account to December 31, 1901, with a balance in its favor of $26,363.60, Cintrón Hermanos again expressing their conformity therewith on January 31, 1902; that according to the account of the administration of the "Laura Central," opened for the collection of the debt of $12,176.90, and the cost of administration, after having credited thereto, in due time, all the products of the estate there was due the bank on June 30, 1902, a balance of $14,606.69, without a single cent having been credited to the first mortgage; that whether said firm of Cintrón Hermanos is dissolved or not it and each of its members were at all times bound to answer for the performance of the contract and its consequences; that immediately after the cyclone of August, 1899, Cintrón Hermanos being behind in the payment of their debt and with the buildings and factories destroyed by the hurricane, they secured additional funds from the bank and had it assume the administration of the Estate, which it accepted for the collection of the new account, but without binding itself to continue longer than it

should deem it advisable and as far as it deemed proper; that notwithstanding the cost of rebuilding the buildings were defective and the manufacture very costly, for which reason it sought to have the crop of 1901-02 ground by the "Mercedita Central," which proposition it submitted to Cintrón Hermanos, who replied that although the bank could do what it thought best, they considered this idea ruinous for the Estate, and requested the installation of new machinery and factories, in view of which and limiting the expenses of new repairs as far as possible, the grinding was begun in the "Laura Central" until the manufacturing season having ended it was impossible to conclude it owing to the bad working of the apparatus and on account of the inclemencies of the weather, and it became necessary to grind the last sugarcane at the adjoining "Mercedita Central" in order to save it from being lost; that as it could no longer continue with the burden of the administration it instituted the compulsory proceedings for the foreclosure of the mortgage and stopped the monthly allowance which they made Cintrón Hermanos for their support; that an error was made in the complaint in the action for the recovery of the mortgage debt, which error was afterwards corrected in liquidating the credit secured by the second mortgage; the error was of no importance because the second mortgage debt was not the basis of the execution; that the liquidation of the amount of the debt contracted by the instrument of April 29, 1895, does not contain any error whatsoever it being the real result of the arithmetrical calculations made; that the novation and confusion alleged by Cintrón Hermanos did not exist; that the bank did not mention in its complaint in the execution proceedings the facts the omission of which Cintrón Hermanos noted, because they had nothing to do with the mortgage debt the subject of the execution; that it did not keep silent with regard to the submortgage constituted in favor of the holders of bonds of the mortgage debt which it was sought to foreclose, because the deed of such submort-

gage mentioned in the certificate issued by the Registrar of Property of Humacao attached to the complaint in the execution proceedings added that there were no third persons to whom intervention could be given in the proceedings, and in so far as the action for the annulment of the said submortgage was concerned, it was not considered in the execution proceedings because it had nothing to do with them; that the notices published for the sale contained all the circumstances required by law; that the second sale was held in Guayama because the District Court of Humacao was sitting there; that Cintrón Hermanos entered an appearance in the summary proceedings seeking to delay their prosecution, and the court held that they were not parties to said proceedings, in which all the formalities required by law have been observed, without any act entailing the annulment thereof having been committed; and that in addition to the want of a right of action on the part of the plaintiffs, an exception of lack of legal capacity could also be pleaded, both because Zoilo Cintrón, a partner, is not represented in the proceedings, and because Aurea Cuadra has not proved the capacity in which she appears.

The bank cited as provisions of law in support of its claims articles 128 of the Mortgage Law, 171 and 172 of the Regulations for its execution, 1517, 1527 and 1455 of the Law of Civil Procedure, and 1160, 1171 and 1172 of the Civil Code, and concluded with the prayer that the complaint be dismissed, with the costs against the plaintiffs.

With regard to the evidence submitted in the proceedings, it is to be noted that the marriage of José Facundo Cintrón to Aurea Cuadra has been proved, of which marriage were born the children José and José Luis, now represented by their mother, and that of the documents executed by the Banco Territorial y Agrícola and the firm of Cintrón Hermanos, to which both parties make reference in their allegations, the record contains only copies of the instrument of April 29, 1895, which was that which served as a ground for

the compulsory proceedings; and that of May 19, 1900, by which Cintrón Hermanos placed a second mortgage in favor of the bank; and of that of May 23, 1900, which in addition to setting forth the agreements therein stipulated made reference also to the instrument of April 29, 1895; of that of August 4, 1899; of that of November 16th of the same year; of the private document of March 17, 1900; of the liquidation of credits of the same date; and of the mortgage deed of May 19, 1900.

The record also contains a certification or transcript of the record of the compulsory proceedings showing the facts which we have already stated with regard to said proceedings; but it does not contain a copy of the certification of the charges which the bank maintains it attached to the complaint in the execution proceedings, and which we have no doubt was submitted.

The record also contained the accounts of the administration of the "Laura Central" from the time the bank assumed charge of such administration until June 30, 1902; and from these accounts, to which Cintrón Hermanos, represented by Aurelio Dapena or Mariano Martorell, agreed, it appears that on the last-mentioned date the said firm owed the bank a net balance of $14,606.69. It should be noted that the signatures of Dapena, now deceased, were compared with other undoubtedly genuine signatures of his by the handwriting expert, José Becerra, who gave assurance of their authenticity, and that counsel for the plaintiffs stated, at the second session of the oral trial, that he accepted as authentic the signatures of Martorell approving on January 31 and June 30, 1902, the accounts of the administration of the "Laura Central," although he did not thereby recognize authority sufficient in him to extend such approval.

Counsel for the bank, Juan Guzman Benitez, stated at the oral trial that on May 23, 1900, in pursuance of the instrument of that date, the bank took charge of the "Laura Central" in order to collect debts other than mortgage debts con-

tracted by Cintrón Hermanos, without crediting the said firm with the value of the sugar-cane crops of said central, because such sugar-cane was security for a debt and could not be so credited; but it did credit to Cintrón Hermanos on the account of the administration of the "Laura Central" with the product of such sugar-cane, and charged against them the expense of the cultivation of the cane and manufacture of the sugar; and with regard to the rails, cars and other personal property, it did not credit them to said Cintrón Hermanos either, because they constituted the security for another debt, for the payment of which they will be sold in the event of Cintrón Hermanos failing to make payment in accordance with the aforesaid instrument of May 23, 1900.

Experts José Ramirez y Gonzalez, Antonio Lopez and Andres Antelo, appointed by Cintrón Hermanos and accepted by the bank, stated in a report dated April 12, 1904, and ratified at the time of the oral trial, that having examined 157 *cuerdas* of sugar-cane still to be ground, they had found it in an exceedingly bad state of cultivation and that the sugar-cane consisted of the worst varieties known in the Island; that these 157 *cuerdas* would probably not yield more than the average of 292 quintals per *cuerda* of those already ground; that no planting whatever of *gran cultura* had been made for the crop of 1905, and there were only a few *cuerdas* of *primavera* and some land in course of preparation to continue the work of planting for the crop of said year; that the factories, machinery and apparatus were in good condition; that there were 82 yoke of oxen in bad condition due to neglect and the excessive work foreign to the Estate; that the 6 kilometers of railway were in a fair condition, and of the 99 cars on hand there were 87 in use; that there were only 8 box carts with wooden axles, in bad condition, plows, yokes, chains, etc., and the necessary equipment for this deficient agricultural material; that the loss and deterioration could be deduced from the condition in which the central was which showed a disastrous administration, as there was nothing to

indicate zeal, care, foresight or attention in the proper maintenance and development thereof; that of about 1,200 *cuerdas* of which the estate consists only 444 had been cultivated and about 60 were in course of preparation and in new planting, and that there should remain 700 *cuerdas* of magnificent pasture land whereon the 164 oxen of the Estate could be maintained in perfect condition, and about 400 or 500 head of cattle more, which on shares or on pasture might produce a profit of $3,600 per annum, notwithstanding which the oxen of the Estate were in a lamentable condition and there was not sufficient pasture for their sustenance; that taking into consideration the favorable conditions of the estate and the capacity of its machinery and apparatus, 10,000 sacks of sugar might be obtained during the period of each year's crop and a net profit of $30,000, without taking into consideration the profit which the still might yield, the rum of which has always been of a superior quality, in order to make up any difference which might be noted in the previous calculation; that during the crop of 1902 a net profit of $7,910.92 was obtained, and during the crop of 1903 there was a loss of $6,227; that the amount of damages suffered by the "Laura" plantation during the administration of the bank is equal to the sum of the profits not obtained during each agricultural year since it assumed the administration; and that the cause of the loss suffered was due solely to the maladministration of the bank.

The District Court of San Juan, on the merit of the arguments of the parties and the result of the evidence submitted, rendered judgment by a majority vote on June 28th of last year, the conclusions of law' and adjudging portion of which read as follows:

"A second sale was held in the city of Guayama, a place other than the habitual seat of the court, the published notices not stating the place where the sale was to be held, as prescribed by the second subdivision of article 172 of the Regulations for the execution of the Mortgage Law, but it should be .inferred from the circumstances that

as Humacao is the capital of the district, the notices were dated in said city, the municipal district of Yabucoa, in which the mortgaged estates are situated, belongs to the subdistrict of Humacao; the sale should have been held in Humacao and not in Guayama, a defect entailing the nullity of said second sale, and also voiding the award of the mortgaged property to the mortgagee bank on account of a lack of bidders who might have gone to Humacao.

"In cannot be argued against this annulment that according to General Order No. 15, Series of 1900, section 4, the Humacao court, whether sitting in Caguas or in Guayama, retains its jurisdiction, because the jurisdiction of said court to take cognizance of the mortgage proceedings the annulment of which is involved and to hold the respective sale as an integral and material part of the proceedings, is not the subject of discussion, but the fundamental defect consists in that the notices did not state the place where the second sale was to be held, nor was said sale then held in the place where it would naturally be supposed by the bidders to be held, thus curing the defect complained of, taking into consideration the reasons stated.

"Furthermore, said second sale is null also because article 128 of the Mortgage Law authorizes one sale and no more, and it cannot be maintained that the Regulations for the execution of the Mortgage Law make rules for a second and subsequent sales, and that the Mortgage Law by the eighth subdivision of its article 172 provides that the Regulations shall determine the other details of the summary mortgage proceedings, because the regulation of details of proceedings cannot be construed as authorizing the adoption of proceedings incompatible with the express and specific text of the law.

"The other grounds for annulment alleged in the complaint cannot be considered, and it is not deemed necessary to discuss each one of them specially.

"The bank having assumed the administration of the mortgaged estate 'Laura,' to cover the proceeds therefrom a debt not secured by mortgage, according to an express agreement embodied in the sixth clause of the instrument of May 23, 1900, there is no ground for the allegation of the plaintiff that there existed a novation of the mortgage loan contract, thus converting it into an antichresis with all the juridical consequences inherent in this form of extinguishing contractual obligations.

"There is no reason to adjudge the bank to return the fruits and profits collected, nor that it credit them to the plaintiffs, because such products have been applied to the payment of debts not secured by mortgage, according to the agreement, the respective accounts

having been approved by the representatives of the Estate of Cintron, Depana and Martorell who, according to the eleventh, twelfth and thirteenth clauses of the instrument of May 23, 1900, had the right to act under full powers on behalf of said Estate; nor could the annulment of the award have the effect of adjudging a return of the fruits, because the bank at the time the award was made being in possession of the Estate and collecting its products, as agreed, to apply them to the payment of debts not secured by mortgage, it is not possible to order such return and set aside the efficiency of this agreement, which has not been the subject of discussion in these proceedings from this point of view.

"According to the jurisprudence of the Supreme Court of Spain and the provisions of the Civil Code applying to the subject of indemnity for losses and damages, the latter are not demandable when not caused by fraud, fault or negligence on the part of the defendant, such indemnity will not be ordered as a consequence of the annulment of proceedings when they were not brought because of acts of the defendant.

"For the reasons stated in the foregoing conclusions of law, the prayer of the plaintiff for a general liquidation of credits, and that the bank be required to continue the administration of the estates mortgaged, unless there be an agreement to the contrary, cannot be entertained.

"If all the claims of either of the parties are not rejected, no special taxation of costs should be made.

"In view of the provisions of the articles cited and those of general application of the Law of Civil Procedure, General Order No. 118, Series of 1899, we adjudge, that we should dismiss and we do deny the various prayers contained in the complaint, rendering judgment in favor of the bank, except in relation to the petition for the annulment of the second public sale, the subsequent proceedings and the order of award, which proceedings we declare null, without any special taxation of costs.

"So by this our judgment pronounced, ordered and signed.— Juan Morera Martinez; Frank H. Richmond; Jose Tous Soto."

## The dissenting opinion reads as follows:

"*Dissenting opinion of Presiding Judge Juan Morero Martinez.*— The presiding judge, when the vote was taken on the judgment, dissented with respect to the declaration of the annulment of the second sale, the subsequent proceedings and the order of award, and cannot

agree in this point with the declaration made nor with the first two conclusions of law of the judgment, nor with the last, but he accepts the others and he believes that the judgment should contain the following:

"The summary proceedings prosecuted by the Banco Territorial y Agrícola against Cintrón Hermanos are based upon the nonpayment of net sums due under the mortgage deed of April 29, 1895, according to the third clause of which the entire debt is to become due and payable when two of the half-yearly installments become due and payable, as has occurred; the right which it has thereunder to collect the interest agreed on at the rate of 9 per cent per annum, and the insurance premiums paid by the bank and the commissions agreed on, the first complaint in the proceedings stating that it had agreed to indemnify any loss and damage caused the debtors or third parties, as the law prescribed, therefore it is not possible to annul the proceedings and replace matters in the condition in which they were at the beginning of the proceedings.

"As the other mortgages and contracts, or their liquidations, have absolutely nothing to do with the mortgage sought to be foreclosed, on account of their not affecting it in the least, it is not possible to take these credits and their instruments into consideration in the summary proceedings, and still less the delivery by Cintron Hermanos to the bank of the administration and direction of the 'Laura' estate and appurtenant estates in accordance with contracts of a subsequent date, this being very clearly explained by the sixth clause of the instrument of May 23, 1900.

"The summary proceedings having been prosecuted in due form, the first and second sales having been held, the notices having been published in a newspaper, in the town of Yabucoa and in the usual place in Humacao, with all the indispensable details, without any bidders appearing at the second sale, it is not possible to annul it on account of its having been made by the District Court of Humacao in Guayama, during its regular term in the latter town; inasmuch as General Order No. 15, of January 25, 1900, provides that the court of Humacao, whether sitting at this point or in Caguas or Guayama, always retains its jurisdiction, with the sole exception that while sitting at each of these points it may only hold oral trials pertaining to the municipal districts assigned to said points, as enumerated in the order.

"As the notices stated that the sale would be held in the District Court of Humacao, setting a day and hour, as no bidder in Yabucoa, Humacao or in Guayama having protested, and it not having been

proved that any one protested on the date of the sale or that any one appeared to bid, it is not possible to annul the second sale; nor can the nullity be deduced from the provisions of article 128 of the Mortgage Law, because although the third paragraph thereof provides that 'If there is no bidder, the execution creditor may demand that the property be awarded to him, being responsible for all prior liens, if there be any,' this does not signify that only one sale can be held under the law, because the last paragraph of the article provides: 'The Regulations will prescribe the other details to which the summary proceedings must conform,' and article 172 of the Regulations allows not only the second sale, but subsequent ones.'

"The right to dispose of the thing mortgaged for the purpose of obtaining a payment which the debtor delays or refuses, is perfectly inherent in the nature of a mortgage; and for this reason it is not possible to deny a right which may be exercised by legal proceedings, the requisites required by the law as a certain guarantee that the debtor will not be exploited to the immoral enrichment of the creditor, which shows the necessity of subsequent sales and permits of compliance with the ends and purposes of the law, causing lack of confidence to disappear, attracting capital and giving the lender assurance of prompt and easy collection.

"The other conclusions of law are accepted, the following being substituted in the place of the last one:

"All the claims contained in the complaint being denied, the costs must be taxed against the plaintiffs.

"I believe that the complaint should also be dismissed as to the prayers in the first paragraph, and especially with relation to the petition for the annulment of the second sale, the subsequent proceedings and the order of award, which proceedings, as all those of the summary mortgage proceedings, we hold to be valid, with the costs against the plaintiffs.—Juan Morera Martinez."

From the judgment rendered both parties took an appeal; the bank on account of the summary proceedings beginning with the second sale having been annulled, and the plaintiffs on account of their other prayers in the complaint having been denied. These appeals, after hearing the written and oral arguments of the parties, are now awaiting the decision of this Supreme Court.

The legal questions submitted for discussion in connection

with the first pronouncement sought in the prayer in the complaint, are the following:

1. Novation of the deed confessing an indebtedness, the basis of the initial complaint in the compulsory proceedings brought by the Banco Territorial y Agrícola against the firm of Cintrón Hermanos, for the partial recovery of the mortgage debt contracted by public instrument of April 29, 1895.

2. Confusion in the same person, of the character of creditor and debtor, under the public instrument of May 23, 1900, thus extinguishing the mortgage obligation sought to be enforced.

3. Nondemandability of said mortgage obligation, on account of it not being certain, liquidated, nor due, in view of the contents of the instrument of May 23, 1900, by virtue of which the bank assumed charge of the administration of the "Laura Central," for the recovery of the mortgage debt.

4. Failure to serve notice of the sale of the "Laura Central" to the holders of mortgage bonds, in violation of the second paragraph of article 172 of the Regulations for the execution of the Mortgage Law, on account of such holders being the creditors of the banking institution, who have their rights recorded in the mortgage debt claimed, and, finally, in the estate sold.

5. Omission of the publication of the notices in the usual public places in the place where the proceedings were being had, and where the mortgaged property is situated, and omission of the insertion thereof, three times at least, in the newspapers having a circulation in this Island, as is the uniform practice, without the value or price of the property to be sold being stated.

6. Holding of the second sale in an improper locality, that is to say, in the city of Guayama, which was not the place advertised, nor could it have been, in the only notice published a single time in the *Heraldo Español,* and not posted in the usual public places.

7. Holding this second sale with a reduction of 25 per cent

in the appraised value of the mortgaged property, when article 127 of the Mortgage Law authorizes one sale only.

8. Failure on the part of the bank to deposit the $9,149.23 remaining after covering the debt claimed by the award made to the bank of the property sold, said sum having been applied to the payment of another subsequent debt, which had not been the subject of the claim.

9. Diversion of property of the debtors under the pretext and by reason of the sale, such property being that not included in the mortgage, nor included in the sale, and constituting security for obligations very different from the mortgage debt claimed.

Let us examine these questions.

The novation of the deed which served as a basis for the execution proceedings instituted by the bank does not exist, because said bank took charge of the administration of the "Laura Central," not to recover the mortgage debt which has been the subject of the compulsory proceedings, but to recover another nonmortgage debt amounting to $12,176.90, which Cintrón Hermanos owed the bank, as appears from the second, fourth and sixth clauses of the public instrument of May 23, 1900, although the said bank could also have applied for and assumed that administration for the recovery of the first mortgage referred to in the public instrument of April 29, 1895, according to the tenth clause of said instrument. And it cannot be affirmed that the debt, for the payment of which the bank assumed the administration of the "Laura Central," had been already paid on the date the compulsory proceedings were instituted, and that, therefore, the bank was administering the "Laura Central" at that time to devote its products to the payment of the mortgage debt, because the accounts of the administration existing between the bank and Cintrón Hermanos, which appear of record, reveal the contrary.

We do not understand the confusion by the bank of the characters of creditor and debtor, on account of it having

taken charge of the administration of the "Laura Central", to collect from the proceeds thereof the debt of $12,176.90; but even assuming that such confusion did exist, it can have no influence whatever on the extinction of the mortgage obligation claimed by the bank, because one obligation is entirely independent of the other.

The mortgage debt claimed by the bank in the compulsory proceedings had been constituted by a public instrument of April 29, 1895, duly recorded in the Registry of Property of Humacao, and, therefore, it was certain; it was also net, because it represented the sum of $58,103.02 based upon arithmetical calculations, from data contained in the instrument itself; and, finally, it was due and payable, as shown by said instrument and as confessed by Cintrón Hermanos in that of May 23, 1900; and the administration of the "Laura Central" by the bank cannot be invoked in opposition, because it has already been stated that said administration bore no relation to the recovery of the mortgage debt claimed, but did relate to a debt of a different nature. The mortgage debt claimed was, therefore, certain, liquidated, and due and payable, and therefore demandable.

The record does not contain the certification of the encumbrances on the "Laura" Estate, which was attached to the initial complaint in the compulsory proceedings; but even admitting that this certification should show the holders of the mortgage bonds of the bank, such documents being documents payable to bearer, and, therefore, the names of their owners being unknown, as well as their residences, such holders cannot be affected by the provisions of the last paragraph of article 171 of the general Regulations for the execution of the Mortgage Law, nor the second paragraph of the following article. Counsel for Cintrón Hermanos himself recognizes this in stating that although the holders of the mortgage bonds of the creditor bank *are not in a strict sense really subsequent creditors ordered cited by the second paragraph of article 172 of the Regulations for the execution of the Mort-*

*gage Law,* they are at least as interested as they are in the sale.

The notices announcing the first and the second sales were posted in the usual public places in the city of Humacao, where the proceedings were being had, and in the town of Yabucoa, where the property sold is situated, and were inserted in the newspaper *El Heraldo Español,* published in this capital, the property being described as it appears in the deed upon which the execution proceedings were instituted, the value given to each estate being set forth, and, in addition to these formalities, that the sale would be held in the District Court of Humacao. The first sale was held in Humacao and the second in Guayama.

The first sale held in the city of Humacao was valid, because in addition to the notices complying with all the formalities prescribed by law, the sale took place in the city of Humacao, the regular seat of the Humacao court, and the place where it was to be presumed that the sale would take place.

The same is not the case with the second sale, because although the notices complied with the formalities of law, the sale took place in the city of Guayama, a place other than the regular seat of the court, that is to say, the city of Humacao, which was where the sale was to be held, according to the terms in which the notices were drawn. Proof of this is to be found in the fact that the notices for the first sale announced that it would be held in the District Court of Humacao, and said court understood that the place for the sale was the city of Humacao, and it was there it was held.

It is true that General Order No. 15, of January 25, 1900, provided in the second and third sections thereof, that the Humacao court should convene in Caguas for a term not exceeding fifteen days, every three months, to hear and determine the civil and criminal matters corresponding to the jurisdictions of Caguas, Aguas Buenas, Hato Grande (San Lorenzo), Gurabo and Cidra, and that in the same manner

and for the same term said court should convene in Guayama to hear and determine the civil and criminal matters especially pertaining to the jurisdictions of Guayama, Cayey, Salinas, Arroyo, and Patillas; and the court according to section 4, whether sitting at Humacao, Caguas or Guayama, should always retain its jurisdiction, without any other limitation than that of being able to hold in Caguas, Guayama and Humacao oral trials, both civil and criminal, pertaining only to the respective municipal districts mentioned in said general order.

As will be observed, the city of Humacao was the regular seat of the court, because every three months for specific terms only could it convene in Caguas and Guayama; but the general order referred to does not fix the exact and specific dates the court is to convene in Caguas and in Guayama, and the record does not show, nor have the parties stated the manner and form in which the public was informed, that the court would convene in the said towns.

From what has been stated, it is doubted whether or not the public knew that the court of Humacao was sitting in said city, in that of Caguas or in that of Guayama, the day the second sale was held; and it is to be presumed that Humacao being the seat of the judicial district of that name, the notices being dated in said city, and the mortgaged property being situated in the municipal district of Yabucoa, the public would believe that the sale would take place in Humacao.

In order to hold this sale in Guayama, it should have been announced in advance in the notices, as prescribed in the second paragraph of article 172 of the Regulations for the execution of the Mortgage Law. And it cannot be maintained that courts, in fixing the place where a sale is to be held, are in the habit of using an ordinary form to the effect that such sale will be held before the court which authorizes the notices, because, although such a practice is admissible when a court exercises its full jurisdiction only in the seat of a district, this was not the case when the exercise of that

jurisdiction may take place in other points, as occurred with the Humacao court with respect to the cities of Caguas and Guayama.

Furthermore, if the sale was to be held in Guayama the *calls* should also have been published there on account of being the place where the proceedings were being had; and for this reason and that stated above, to the effect that the second sale had been held in a place not fixed in the notices, we understand that the second sale held in Guayama was null; but we do not hold that such sale is null by reason of a violation of the provisions of article 127 of the Mortgage Law, which reads as follows:

"The mortgage deed shall contain the value at which the contracting parties appraise the estate, in order that it may serve as a basis for the only public sale to be held, in the event that upon the expiration of the term of the loan the payment of such loan should not appear of record in the registry of property."

In the general terms in which it is drawn, this precept would provide a single sale both for the foreclosure of the first mortgages and for that of the second and subsequent mortgages, and, consequently, it would be logical to deduce that in any compulsory proceedings for the foreclosure of a mortgage only one sale could be held.

Such doctrine is in open contradiction to article 128 of said Mortgage Law, the second paragraph of the fourth subdivision of which states in general terms: "Such subsequent sales as may be to the interest of the execution creditors praying therefor may be held at their expense, provided they prove by means of a certificate from the registrar, that they have not as yet been paid." It is also in contradiction with Regulations for the execution of the Mortgage Law which prescribes the procedure to be followed for the recovery of a mortgage debt, without making any distinction between first and subsequent mortgages, which procedure provides for a

second sale with a reduction of 25 per cent in the price which served as a basis for the first sale.

The former Law of Civil Procedure, which is applicable as a supplementary law to summary compulsory proceedings, according to the last paragraph of article 176 of the Regulations for the execution of the Mortgage Law, also allowed a second sale; and in the statement of reasons which precedes the project of the law of May 26, 1893, for the amendment of the Mortgage Law, we find the following statements:

"But where the voice of experience has been heard with the greatest clamor against the law, demanding immediate relief, is where it refers to the procedure for the recovery of mortgage credits. Its crushing confusion, the uncertainty of results, and its incalculable cost restrain capital or suggest usurious conditions; sales and resales take the place of loans, with the object of avoiding all proceedings to the prejudice of the landowner; interest is stipulated which triplicates the capital loaned, and perhaps by the employment of other means the debtor is exposed to criminal liability, converting the sanctity of laws enacted for the punishment of crimes into a vile instrument of avarice against the unfortunate. Distrust causes these means to be employed because the legal procedure does not satisfy the reasonable demands of business, and to uproot these evils, to furnish land the capital it needs and to give the lender assurances of prompt and easy recovery of his loans, is the object of the most important reform proposed by the government, abolishing proceedings which, without positively guaranteeing one's rights, destroy those most sacred. Previous appraisement, uniformity in the jurisdiction of the courts in all necessary proceedings, abolition of all litigation, a single summons and immediate sale, such are the bases of the new legislation. We have abolished trials, benefits of discussion, letters rogatory, writs of attachment on property already mortgaged, incidental issues, simultaneous public sales, and a great many other barriers in the path of territorial credit, which had been placed there with the best of intentions, but which found only victims who had acted in good faith."

If only a single sale had been permitted, as claimed by counsel for Cintrón Hermanos, for the collection of the first mortgages, instead of the first mortgage creditors deriving

any advantage by the amendment of the procedure, they would have been prejudiced when the purpose of the Mortgage Law and the Regulations for its execution was precisely to protect above all the rights of the preferred creditor or creditors.

We cannot see any reason why, in view of the text of article 127 of the Mortgage Law, counsel for the firm of Cintrón Hermanos maintains that only one, sale can be held for the recovery of a debt secured by a first mortgage, while a second sale can be held for the recovery of debts secured by second or subsequent mortgages.

Article 127 of the Mortgage Law is general, as the second paragraph of the fourth subdivision of the article following is general, and if in view of this paragraph the second sale is admissible for the second or subsequent mortgage creditors, it must for the same reason be admissible for the first; and we say for the same reason, because if the first creditors are preferred with respect to the second, the latter are preferred with respect to the third, and so on successively. The reasons advanced by counsel for Cintrón Hermanos against the admission of more than one sale for the first mortgage creditors in order not to prejudice the subsequent ones, apply equally to the second mortgage creditors with respect to the subsequent creditors of the same class, and thus successively.

We repeat that the second sale was null on account of the fact that it was held in Guayama, without having been previously announced in the notices; we maintain that article 127 of the Mortgage Law, in so far as it relates to a single sale, has been repealed by subsequent provisions of the Mortgage Law itself and of its Regulations, which are in open contradiction to a single sale, and which must prevail, as they constitute the last expression of the will of the legislator, and as they conform to the ends sought.

The second sale having been null, the order of award to the bank of the property sold was also null, and there would be no purpose to be gained by entering upon a consideration

of the other grounds alleged by Cintrón Hermanos in support of the nullity of said order.

With regard to the second and third pronouncement prayed for in the supplementary prayer of the complaint, that is to say, that the Banco Territorial y Agrícola be required to indemnify the members of the dissolved firm of Cintrón Hermanos for all loss and damages caused them by its administration and the compulsory proceedings, as also to pay them not only the profits derived from the property awarded, but also those which such property should have produced since it assumed charge of the administration, it is advisable to call attention to the fact that this indemnity for loss and damage and this payment of fruits produced and which should have been produced, may refer to two different periods, one of which comprises the time between May 23, 1900, when the bank assumed charge of the administration of the "Laura Central," to May 26, 1903, when it was placed in possession of the property sold by virtue of the order of award March 30th of the year last mentioned, the other period comprising the time elapsed since the date of possession.

During the first period mentioned the bank administered the "Laura Central," for the payment of the debt of $12,-176.90 agreed in the instrument of May 23, 1900, and not for the collection of any mortgage debt, and it was provided in the sixth clause of this instrument that the bank would sell the fruits and products of the estate and credit the proceeds therefrom to the account of the former debt, and that it would make the expenditures which it might deem necessary to the extent it might consider convenient for the maintenance of the cultivation and crops and the manufacture thereof, to convert them into salable products, charging such expenditures to the debit of said account, it being further agreed in the eleventh clause of said instrument that Cintron Hermanos would approve or question, stating their reasons therefor, the accounts of the expenses of the administration of the estate

in the offices of the bank every thirty days, reckoned from the date of the administration, and that in the event Cintrón Hermanos did not make any objections within the terms mentioned, they agreed to accept the results of the accounting of the bank.

These accounts were rendered by the bank, and on January 28, 1901, they showed a balance in its favor of $17,810.67; on June 30th of the same year another balance in favor of the said bank of $11,723.44; on December 31st of the same year another balance in favor of the bank of $26,353.60, and on June 30, 1902, likewise another balance in favor of the bank of $14,606.69. These accounts were not questioned by Cintrón Hermanos who, far from doing so, approved them; and the most noteworthy fact is that they have made no specific and justifiable objections to these accounts in their complaint, as called for by the frank character of the judicial debate, in order that such objections might have been answered in due time and to enable this court to decide whether the bank acted in a fraudulent manner in its administration or not, and whether it did or did not incur enforceable liabilities.

The record does not show whether the bank submitted accounts of its administration to Cintrón Hermanos from June 30, 1902, to May 26, 1903, when its administration of the "Laura Central" ceased and it entered into the possession thereof as owner; and as such possession is null on account of the second sale of the "Laura Central" having been null, and the possession derived from the null order of award under which it was given being also null, we understand that the condition of the bank is reduced to that of administrator of the "Laura Central," and in this capacity it is required to submit to Cintrón Hermanos accounts of its administration, from the date of the last accounts it rendered.

The bank cannot be required to indemnify Cintrón Hermanos for any loss or damage caused by its administration, from May 23, 1900, to June 30, 1902, when it rendered its

last accounts, nor that it pay Cintrón Hermanos the profits produced or which should have been produced under said administration, because Cintrón Hermanos have not proved, as it was their duty to prove, that they should have been credited with larger profits than those credited to them by the bank in its accounts, which were approved. The report made by the experts refers to observations made at the "Laura Central" on April 12, 1904, and, therefore, subsequently to the date on which the bank took possession thereof under the award, and it is not possible to deduce from its condition, at that time, what was its condition during its administration by the bank.

Nor can any indemnity for loss or damage be granted nor credit given for the profit derived and which should have been derived from the time the bank took possession of the "Laura Central" under the award on May 26, 1903, because the nullity of the second sale alone, which is not due to fraud, but to an incorrect juridical interpretation, does not determine such indemnity, and in order to credit the profits derived and which should have been derived during the possession of the bank under the award, it is necessary that it render the proper accounts, to which Cintrón Hermanos may make the proper objections, in accordance with the stipulations contained in the instrument of May 23, 1900, because by reason of the nullity of the award the character of administrator which the bank formerly had has revived, and in harmony with the character both the bank and Cintrón Hermanos must conform to the provisions of said instrument of May 23, 1900, which is a law for the contracting parties.

With regard to the last pronouncement prayed for in the complaint, that is to say, that experts to be designated by the parties and a third one to be appointed by the court in the event of disagreement, be required to make a liquidation of all mortgage credits and other credits of the bank against Cintrón Hermanos in order that the real amount thereof being known it may be paid the bank from the proceeds of the

property sold, which the bank shall continue to administer subject to the agreements contained in the instrument of May 23, 1900, unless the parties should come to a different agreement in view of the result of such liquidation, it appears to us that such a liquidation is unnecessary, because the ordinary credits of the bank against Cintrón Hermanos are clearly defined in the instrument of May 23, 1900, and the mortgage debts also appear in the instruments of April 29, 1895, and May 19, 1900; the credits in favor of and the charges against Cintrón Hermanos to be made in connection with the administration of the "Laura Central," the purpose of which administration was the payment of a debt sought to be enforced in compulsory proceedings, must be made in the form agreed to by the parties in the eleventh clause of the instrument of May 23, 1900; and neither can the bank be compelled to make use of the power which it reserved of demanding the administration of the "Laura Central" for the payment of the mortgage debt claimed, the exercise of such power being, as it was optional with said bank.

For the reasons stated, affirming the judgment appealed from by both parties in the points accepted, and reversing it as to the remainder, the summary execution or compulsory proceedings instituted in the District Court of Humacao by the Banco Territorial y Agrícola against the agricultural industrial company of Cintrón Hermanos, for the recovery of a mortgage debt, should be declared null from the point where the second sale was held in Guayama on March 17, 1903, and that the proceedings be brought back to the state in which they then were, and that the other prayers of the said firm formulated in its complaint be denied, without prejudice to the rights it may have with respect to the accounts of the administration of the "Laura Central," which the said bank is compelled to submit to said Cintrón Hermanos, dating from the date of the rendition of the last accounts produced, in accordance with the agreement of both parties contained in

the public instrument of May 23, 1900, without any special taxation of costs in either instance.

*Decided accordingly.*

Chief Justice Quiñones and Justices Figueras and Mac-Leary concurred.

Mr Justice Wolf did not take part in the decision of this case.